HOOD, Judge.
This suit was instituted against Barks-dale Federal Credit Union to recover benefits alleged to be due under the provisions of a credit life insurance policy. Plaintiffs are the surviving father, mother, brothers and sisters of Ruben Musquez, deceased. Judgment was rendered by the trial court in favor of plaintiffs. Defendant appealed.
The principal issues presented are whether Barksdale Federal Credit Union obligated itself to loan Ruben Musquez a sum of money prior to the death of the latter, and whether a credit life insurance policy insuring the life of the decedent for the amount of that loan was in effect at the time of his death.
Ruben Musquez died on March 9, 1975, as the result of injuries which he sustained in an automobile accident the preceding day. Plaintiffs are his sole surviving heirs. For some time prior to his death he and his father, Ben Musquez, were in the armed forces of the United States and were stationed at Fort Polk, Louisiana. Both of them were members of the Barksdale Federal Credit Union, which has its main office in Shreveport and operates a branch office at Fort Polk.
In February, 1975, Ruben negotiated with a saleslady at Gray’s Sales and Service, the *402 Datsun automobile distributor in DeRidder, for the purchase of a Datsun automobile. While conducting those negotiations, he submitted an application to the defendant credit union for a loan to finance the purchase of that vehicle. The application was discussed with and submitted to Warren Davis, a loan counselor employed by defendant, who informed Ruben that it would be necessary for him to have someone else sign the promissory note with him as a co-maker of that note. Ruben’s father, Ben Musquez, thereupon agreed to sign, and he in fact did sign, the note as a co-maker with his son.
The application for the loan was approved by the Board of Directors of the credit union, and Davis then promptly contacted the saleslady at Gray’s Sales and Service by telephone and informed her of that approval. The parties were not able to complete the sale of that automobile, however, because Ruben had failed to make a deposit on it, and the dealer sold that vehicle to someone else before Ruben’s application for a loan was approved.
Ruben then selected another Datsun automobile to purchase, and on March 3, 1975, he executed a written sales agreement prepared by Gray’s Sales and Service for the purchase of that car. On the following day, March 4, he deposited $50.00 with the dealer so that the car would be held until another loan could be obtained. The automobile he selected on that occasion was a little more expensive than was the first one, and it became necessary for him to borrow about $200.00 more than he had originally planned to borrow. Davis informed Ruben that since he was purchasing a different automobile for a different price he would have to make an entirely new application to the credit union for a loan in the increased amount. All of the documents which had been completed in connection with the first loan application were destroyed. Ruben then completed and submitted to the credit union a new application for a loan and all of the documents required by the union at that time. The following documents were completed and submitted by Ruben: (1) An application for a loan; (2) a promissory note signed by Ruben and his father, Ben Mus-quez, the latter signing as a co-maker; (3) three chattel mortgage forms; (4) an application for a certificate of title; (5) a consumer credit disclosure form; and (6) a letter asking the insurer to change the loss payee clause on the policy making it payable to Barksdale Federal Credit Union, at Fort Polk.
The total purchase price of the car was $4,249.46. Ruben planned to pay $612.00 of that purchase price in cash, and to borrow the remaining balance of $3,637.46 from the credit union. The note which he and his father executed, made payable to defendant, was for the last mentioned amount.
The application of Ruben for a loan in the increased amount was approved by all of the proper officials of the credit union. On the afternoon of Friday, March 7, 1975, Davis contacted the saleslady at the Datsun dealership by telephone and informed her that the loan had been approved, and that all that remained to be done was for the buyer to bring to the credit union a slip of paper showing that he had insurance on the car. Davis then informed Ruben that afternoon that “everything was approved and ready,” but that Ruben couldn’t pick up the car until he furnished proof that he had insurance on the vehicle. Davis also called Ruben’s father, Ben Musquez, by telephone on March 7, and informed him that the loan had been approved. He didn’t mention to Ben, however, that it would be necessary for Ruben to furnish evidence of insurance before he could take possession of the car.
Ruben was involved in a motor vehicle collision on the next day, March 8, and he died on Sunday, March 9. He had not picked up the car and the proceeds of the loan had not been disbursed by that time. Plaintiff, Ben Musquez, completed the purchase of the automobile after his son’s death. He obtained a loan from a bank in DeRidder, however, and he used the proceeds of that loan to pay the purchase price.
The by-laws of the Barksdale Federal Credit Union provide that in connection with each loan made by that institution, *403 credit life insurance is provided the borrower, that is, the life of the borrower is insured for the amount due on the loan. That life insurance coverage is provided by the credit union at no cost to the borrower. No formal or written life insurance policy, however, is ever issued to the borrower. All that is required of a qualified borrower to obtain credit life insurance is for him to sign a statement on the loan application to the effect that he is not presently restricted in full time employment by reason of his health. Ruben signed that statement in his application for the above loan.
Harold Hansen, the administrative manager of the defendant credit union, testified that the life insurance coverage which the union provides for each borrower becomes effective on the first day interest on the loan is incurred. He explained that interest begins to run “when the check is cut and the loan is booked and placed into the records.” In the instant suit a check for the amount of the loan had not been “cut,” or issued, by the time of Ruben’s death. The evidence does not show whether the loan had been “booked” or “placed into the records” by that time. It does show, however, that it was customary for a dealer to deliver an automobile to the purchaser upon being informed by the defendant credit union that the purchaser’s application for a loan had been “approved,” although a check for the proceeds of the loan would not be cut or issued until several days later.
Mr. Davis, loan counselor for the defendant credit union, testified that it was the standard policy of that institution to require the borrower to furnish proof of the fact that he had comprehensive and collision insurance coverage affecting the mortgaged automobile. He stated that ordinarily the credit union would inform the dealer that the financing of the car had been arranged, but that in a case where proof of insurance had not been supplied, it would instruct the dealer to not release the ear to the borrower until proof of the required insurance had been furnished. Some of his testimony to that effect is as follows:
“. . . We will inform the dealer that this financing has been arranged, that we are waiting for proof of insurance on that particular vehicle before the release of the vehicle by the dealer can be made.”
SjC * Sfc ^ Jfi #
“. . . Before a — a loan must be approved first, then proof of insurance must be obtained before the vehicle can be released.”
The evidence shows that Davis explained to Ruben that it would be necessary for him to furnish proof of insurance on the car before he could pick up the automobile at the dealer’s place of business. No such explanation was ever made to plaintiff, Ben Musquez.
The promissory note executed by Ruben and his father was payable in 36 monthly installments. The chattel mortgage executed by Ruben to secure that note contains the following provision relating to insurance coverage on the automobile:
“. . . Mortgagor agrees to furnish insurance as required by Mortgagee and failure to furnish such insurance shall authorize Mortgagee, at its option, to obtain such insurance at Mortgagor’s expense, the premiums advanced therefore to be secured by this mortgage and to bear interest at the rate stipulated in the note. It is understood and agreed that Mortgagee is not in any way obligated to obtain such insurance and it will not be liable for any loss incurred by reason of not obtaining such insurance.”
There is no provision in the application for a loan or in any of the documents furnished by Ruben, other than that quoted above, which relates to the mortgagor’s obligation to furnish insurance coverage on the mortgaged automobile. We find nothing in any written instrument relating to the loan sought by Ruben which indicates that the commitment of defendant to make the loan was conditioned on Ruben’s furnishing proof of insurance coverage on the car.
*404 Defendant contends that its obligation to make the loan to Ruben was subject to a suspensive condition, that being that the borrower must furnish proof of insurance coverage on the mortgaged automobile before the contract became complete. It argues that since the borrower never furnished proof of that insurance coverage, the suspensive condition never took place and the contract thus never came into existence. To support that argument, defendant relies on Blaushild v. Rockhold, 7 La.App. 709 (1927); Mire v. Haas, 174 So. 374 (La.App. 1937); and Wagenvoord Broadcasting Company v. LeBlanc, 221 So.2d 282 (La.App. 4 Cir. 1969).
The judgments rendered in the cited cases indicate that a written contract can be made the subject of a suspensive condition, even though the condition is not expressed in the written instrument itself, provided that the condition is implied from the nature of the contract and the presumed intent of the parties.
The trial judge concluded that the requirement of the defendant credit union that Ruben furnish proof of insurance coverage on the mortgaged automobile did not constitute a suspensive condition of the contract, and that a suspensive condition could not be implied from the nature of the contract. He held that “the contract was fully consummated and in effect before Ruben Musquez met his untimely death,” and that “the credit life insurance was also in effect.” We agree with those conclusions.
Prior to his death Ruben signed a sales agreement obligating himself to purchase an automobile from the dealer, and he made a small deposit on the purchase price of that car. He applied to the credit union for a loan to enable him to pay the remaining balance of the purchase price, and the credit union formally approved his application and agreed to make the loan. Ruben and his father executed a promissory note for the amount of the loan. The credit union notified the makers of the note and the dealer that the loan would be made. Ruben then became obligated to purchase the car and to repay the loan, and we believe that the contract to consummate the loan and to provide credit life insurance to the borrower became effective at that time. The trial judge observed, correctly we think, that “Ruben and his father would both have been bound by the agreement, whether or not Ruben ever secured insurance of his own or not,” and that “it would be inequitable to say that the obligor would be bound to the contract but the obligee is not.”
We find no merit to defendant’s argument that the credit life insurance coverage which it agreed to provide for Ruben did not become effective before the latter’s death, and that it would not become effective under any circumstances until the first day interest began to accrue on the loan. We find nothing in the documentary evidence or in the law which tends to support that argument, or to support the legal conclusion expressed by Mr. Hansen to that effect. Ruben and his father were never told that there would be such a delay in making the insurance effective, and we find nothing in the record which would justify a conclusion that the parties agreed or understood that the life insurance coverage would not become effective until interest began to accrue on the loan.
Article 2021 of the Louisiana Civil Code provides that “if the obligation is not to take effect until the event happened, it is a suspensive condition.” LSA-C.C. art. 2026 provides:
“Conditions are either express or implied. They are express, when they appear in the contract; they are implied, whenever they result from the operation of law, from the nature of the contract, or from the presumed intent of the parties.”
In the instant suit there was no express agreement that the loan contract was subject to a suspensive condition. No implication can be drawn from the operation of law, from the nature of the contract or from the presumed intent of the parties, that the obligation was subject to such a condition. The testimony of defendant’s loan counselor indicates that the borrower’s delay in furnishing proof of insurance cov *405 erage may delay him in obtaining delivery of the automobile, but that it would not relieve him of his obligation to pay the note, nor would it suspend the effectiveness of the loan agreement. The chattel mortgage securing the promissory note provides that the credit union itself may obtain that insurance, if it sees fit to do so, and it may add the cost of the premiums to the mortgage indebtedness.
Our conclusion is that the credit life insurance coverage which the defendant credit union agreed to furnish to Ruben in connection with the loan became effective on March 7, 1975, and that that insurance was in effect at the time of the latter’s death. We thus find no error in the judgment rendered by the trial court.
For the reasons herein set out, the judgment appealed from is affirmed. The costs of this appeal are assessed to defendant-appellant.
AFFIRMED.